**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-18-00541-001-TUC-JAS (BPV) |
|---|---|
| Plaintiff, | **ORDER** |
| v. | |
| Eunice Gabriela Javalera-Hernandez, | |
| Defendant. | |

Pending before the Court is a Report and Recommendation issued by Magistrate Judge Bernardo P. Velasco (Doc. 30). In the Report and Recommendation, Magistrate Judge Velasco recommends that the Court grant Defendant's motion to suppress (Doc. 20). The Government timely objected to the Report and Recommendation and requested an evidentiary hearing (Doc. 32). Defendant responded to the Government's objection to the Report and Recommendation (Doc. 33).[1] This matter is ripe for the Court's consideration.

**FACTS/PROCEDURAL HISTORY**[2]

On March 7, 2018, Defendant attempted to enter the United States through the DeConcini pedestrian port of entry. Defendant presented her identification to Customs and Border Protection Officer Roanhorse, who asked follow-up questions regarding

---

[1] The Court reviews de novo the objected-to portions of the Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b). The Court reviews for clear error the unobjected-to portions of the Report and Recommendation. *See Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *see also Conley v. Crabtree*, 14 F. Supp. 2d 1203, 1204 (D. Or. 1998).

[2] Unless otherwise noted the facts in this section are from the parties' stipulation (Doc. 27).

Defendant's crossing history and her current destination. Officer Roanhorse has experience at the border and understands that it is a common practice for pedestrians to attempt to cross into the United States with contraband hidden on their person. "Officer Roanhorse believed that [Defendant] had a larger chest size than what a woman of her frame would have." (Doc. 27 at ¶ 5.) No other individualized, suspicious observations, such as a lump in the chest, loose clothing, or a nervous demeanor, were presented to the Court.[3]

Officer Roanhorse sent Defendant to secondary and had another officer conduct a canine sniff of her person, specifically her chest and groin. The canine went around Defendant's body and came within close proximity to her groin. The canine alerted to Defendant's groin. Officer Roanhorse asked Defendant if she was carrying something and Defendant answered in the affirmative. Officer Roanhorse, with the approval of her supervisor, performed a pat-down over Defendant's clothes. Defendant then removed two packages from her bra and one from her groin area. The packages contained blue pills, methamphetamine, and fentanyl.

Defendant was arrested, and a criminal complaint was filed in this Court alleging that Defendant knowingly possessed with the intent to distribute 50 grams or more of methamphetamine, or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of Section 841 of Title 21 of the United States Code. (Docs. 1, 3.) An indictment later charged Defendant with four counts related to importation or possession of methamphetamine. (Doc. 9.)

---

[3] In its objection to the Report and Recommendation the Government argues for the first time that the facts known to the officer prior to referring Defendant to secondary rise to reasonable suspicion. However, the only reason presented to the Court and the Magistrate Judge in this matter was that Defendant's chest did not match her frame in size or proportion. If the Government had investigated this motion more thoroughly the first time and presented evidence that the officer witnessed a bulge, concealing movements, or loose clothing there would be no question regarding the legality of the search. However, the Government apparently failed to fully investigate this matter before stipulating that "Officer Roanhorse believed that Ms. Javalera had a larger chest size than what a woman of her frame would have." and "Officer Roanhorse is familiar with body carriers at the Port of Entry. In Officer Roanhorse's experience, it is a common practice for persons to hide drugs on their bodies in an attempt to smuggle drugs from Mexico to the United States." (Doc. 27.) The only reason provided for Officer Roanhorse's suspicion was that Defendant's chest did not fit a woman of her frame. This is insufficient to provide any level of suspicion.

On August 7, 2018, Defendant filed the pending motion to suppress, which stated that Defendant was sent to secondary due to Officer Roanhorse's perception that Defendant had a larger chest than a woman of her frame would have. (Doc. 20.) The Government responded on August 10, 2018, and stated that "the relevant facts in this case do not appear to be in dispute." (Doc. 24 at 4:10–11.) On August 16, 2018, Defendant filed a reply, again reiterated that Officer Roanhorse's only reason for suspicion was that Defendant's chest and frame were disproportionate in size. (Doc. 26.) On August 23, 2018, Defendant filed a stipulation as to the facts and requested that the evidentiary hearing be vacated. (Doc. 27.) Magistrate Judge Velasco granted that request. (Doc. 28.) On October 18, 2018, Magistrate Judge Velasco filed a Report and Recommendation, which recommended that this Court grant Defendant's motion. (Doc. 30.) The Report and Recommendation expressed disapproval that something as subjective and arbitrary as the perception of Defendant's chest size for a woman with her body frame would be endorsed by the Government as grounds for suspicion. The Government timely objected and requested an evidentiary hearing arguing that Magistrate Judge Velasco made several misstatements and unsupported assumptions. (Doc. 32.)

First, the Government argues that the Magistrate Judge was unjustified in asserting that "Officer Courtney Roanhorse believed that a small-framed woman with a larger chest was more likely than other body types to smuggle drugs into the United States of America." *Id*. However, given the record before the Magistrate Judge this was a logical inference as the only suspicion before him was that Defendant had a larger chest size than a woman of her frame would have.[4] Second, the Government argues that Magistrate Judge's remarks

---

[4] The parties stipulated to the facts before the Magistrate Judge. (Doc. 27.) Now the Government asserts that it was a misreading of those facts to state that Officer Roanhorse believed Defendant was potentially a body carrier due to the believe that Defendant appeared to have a larger chest size than what a woman of her frame would have. This assertion was clearly explained in Defendant's motion to suppress (Doc. 20) and reply (Doc. 26). The Government in its objection to the Report and Recommendation stated that it believed that "Officer Roanhorse believed that Ms. Javalera had a larger chest size than what a woman of her frame would have" was "shorthand for saying the officer suspected the defendant was hiding something in her chest area or bra." (Doc. 32 at 11.) This conflicts with a plain reading of the stipulation or a reading of the stipulation in conjunction with the pleadings available to the Government at the time of the stipulation. If the government had an issue with the clear implication in this matter that Defendant was sent to secondary

regarding body types or physiognomy were "off-the-mark." *Id*. But again the record before the Magistrate Judge was that the only suspicion was that "Officer Roanhorse believed that [Defendant] had a larger chest size than what a woman of her frame would have." (Doc. 27 at ¶ 5.) Third, the Government argues that there is no indication on the record that a "border-wide policy" has been put into place. (Doc. 32.) The Magistrate Judge does not suggest that there is a border-wide policy, but instead notes that the results of the search do not determine the legality of it or of condoning potential policies that may arise from it. Finally, the Government objects to the Magistrate Judge's focus on the sniff of the groin. *Id*. The Magistrate Judge comments on the inclusion of the groin to the search area as evidence that the canine search of Defendant was arbitrary as the stated suspicion up to that point rested completely on Defendant's chest. The Government instead seems to argue that because it was "*chest* and groin" and that narcotics were found in the underwear that the inclusion of the groin was not arbitrary. (Doc. 32.) The Government argues for the first time in response to the Report and Recommendation that there was reasonable suspicion prior to Defendant being subjected to a canine sniff based on newly discovered facts. (*Id*. at 5 n. 1.) The Court will not accept or rely on the supplemental or new facts presented by the Government.[5] Defendant timely responded to the Government's objection. (Doc. 33.)

**LAW**

The international border presents a special subset of considerations under the Fourth Amendment. *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985). For example, referral to secondary at the border requires no individualized suspicion. *United States v. Martinez-Fuerte*, 428 U.S. 543, 563 (1976). The reasonableness of a seizure under the Fourth Amendment does not rest on the actual motivations of an individual officer, but

---

and subjected to a canine sniff because Officer Roanhorse perceived that Defendant had a disproportionally large chest for her frame, then it should have presented the alternative evidence to the Magistrate Judge.

[5] The Court has discretion to allow new evidence after a report and recommendation is issued by a magistrate judge. *United States v. Howell*, 231 F.3d 615, 622 (2000). The Court declines to provide the Government with a second bite at the apple in this matter. To do so would undermine the effectiveness of the Federal Magistrates Act. Both parties shall be held to the stipulation provided in this matter. The Government's request for an evidentiary hearing is denied.

instead relies on the circumstances when viewed objectively. *Whren v. United States*, 517 U.S. 806, 813 (1996) (internal citation omitted).

Searches at the international border present a different balance of reasonableness than searches conducted in the interior. *Montoya de Hernandez*, 473 U.S. at 538. "[T]he Fourth Amendment balance between the interests of the Government and the privacy right of the individual is [] struck much more favorably to the Government at the border," *id*. at 539–40, because '[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border," *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). The Court has acknowledged that the border may allow factors that would be impermissible in other contexts, such as apparent ancestry or ethnicity. *See Montoya de Hernandez*, 473 U.S. at 538 (citing *Martinez-Fuerte*, 428 U.S. at 563). The result is that intrusions must be viewed in perspective and not that "at the border, anything goes." *United States v. Seljan*, 547 F.3d 993, 1000, 1002 (9th Cir. 2008) (en banc).

The Supreme Court of the United States has held that some searches, defined as non-routine searches, at the border require reasonable suspicion. *Montoya de Hernandez*, 473 U.S. at 541. The distinguishing factor between a routine search and a non-routine search is the degree of intrusiveness. *United States v. Ramon-Saenz*, 36 F.3d 59, 61 (9th Cir. 1994) (explaining that strip searches, body cavity searches, and involuntary x-ray searches are all non-routine searches). The concerns regarding intrusiveness, destructiveness, and offensiveness do not apply equally to a search of people and property. *Seljan*, 547 F.3d at 1000. The United States Court of Appeals for the Ninth Circuit has also held that pat-down searches at the border require "minimal suspicion." *United States v. Ruiz*, 612 F. App'x. 463, 464 (9th Cir. 2015) (mem.) (citing *United States v. Vance*, 62 F.3d 1152, 1156 (9th Cir. 1995)).

## ANALYSIS

The Court adopts and agrees with Magistrate Judge Velasco's finding that the provided explanation regarding why Defendant was subjected to a canine sniff of her person is subjective and insufficient to provide an objective basis for any degree of suspicion. The relevant question is whether any degree of suspicion was needed for the conduct at the border.

The detainment of Defendant by sending her to secondary did not require any individualized suspicion and accordingly, the reasonableness of the seizure does not depend on the actual motivations of the officer. *See Whren*, 517 U.S. at 813. This detention was not actually in dispute, but for the sake of clarity the Court finds that the actual seizure was constitutional.

The remaining issue is what degree of suspicion, if any, is required for a canine search of a person at the border. The legal test of a canine sniff of objects as not a search is well established. *Florida v. Harris*, 568 U.S. 237, 247 (2013); *Illinois v. Caballes*, 543 U.S. 405, 409 (2005); *United States v. Place*, 462 U.S. 696, 707 (1983). The legal test of a canine sniff of a person is less defined. *B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1265–66 (9th Cir. 1999) [hereinafter *Plumas*] (stating that "neither the Supreme Court nor the Ninth Circuit has addressed the issue whether a dog sniff of a person is a search.").[6] The Government argues that the canine alert is irrelevant because none of the searches required reasonable suspicion. (Doc. 24.) The canine alert is relevant. A pat-down at the border requires minimal suspicion, *see Vance*, 62 F.3d at 1156, which the specified explanation that Defendant's chest size did not match her frame does not provide.

---

[6] The Government argues that a canine sniff is not a search by relying on *Harris*, 568 U.S. 237 (2013); *Caballes*, 543 U.S. 405 (2005); *Place*, 462 U.S. 696 (1983), none of which concern a sniff of a person. (Docs. 24, 33.) This assertion is contrary to the binding precedent from the Court of Appeals for the Ninth Circuit. *Plumas*, 192 F.3d 1260. The government points to the location of the action as the deciding factor, but the deciding factor should instead be the expectation of privacy. A school and border both have decreased expectations of privacy while the expectation of privacy is less at the border, the Court finds that the analysis dictates that a dog sniff of a person is a search. *Montoya de Hernandez*, 473 U.S. at 539; *Plumas*, 192 F.3d at 1267. Even *United States v. Kelly*, 302 F.3d 291, 293 n. 1 (5th Cir. 2002), found the canine sniff to be a search. As stated elsewhere, the relevant question is what level of suspicion level is required, if any, to balance the privacy interests and the government's interests in this situation.

Defendant argues that canine sniffs of persons are more intrusive than an "over-the-clothes pat-down" and are frightening. (Doc. 26.) Defendant argues that a canine search should be considered a non-routine search. (Doc. 26.) Defendant points to *Plumas*, 192 F.3d 1260, to argue that the close proximity of the canine is offensive. (Docs. 20, 26, 33.) Defendant illustrates this point by presenting the possibility that canines may be aggressive and could cause serious injury should they attack. (Docs. 20, 26, 33.) Further Defendant argues that this perception would only be heightened as the canine became closer to "private parts" of any individual.

The Government points to *United States v. Kelly*, 302 F.3d 291 (5th Cir. 2002) to state that a canine sniff is a routine border search and therefore no individualized suspicion is required. (Docs. 24, 32.) Specifically, the Government argues that "a dog sniff of a person is less intrusive than a frisk, which requires an officer to lay his or her hands on the person and pat down the person's body." (Doc. 32 at 7 n. 3.)

Because so much of the parties' arguments rely on *Kelly*, 302 F.3d 291 (5th Cir. 2002) and *Plumas*, 192 F.3d 1260 (9th Cir. 1999), it is worth taking a closer look at each case.

In *Kelly*, Kelly crossed the International Bridge Number 1 in Texas into the United States from Mexico. 302 F.3d at 292. A United States Customs Agent was present with a trained narcotics canine. *Id*. The canine began to walk with Kelly and then alerted to Kelly's groin area. *Id*. at 292–93. Kelly was then sent to a search room and an agent performed a pat-down. *Id*. at 293. The search revealed Rohypnol and Valium pills in Kelly's groin area. *Id*. Kelly moved to suppress the evidence arguing that the canine sniff was an unreasonable search. *Id*. The district court denied the motion after concluding that the canine sniff was a "routine border search" which requires no individualize suspicion. *Id*. Kelly appealed to the United States Court of Appeals for the Fifth Circuit. The Fifth Circuit acknowledged that "ordinary pat-downs or frisks, removal of outer garments or shoes, and emptying of pockets, wallets, or purses are all routine searches, and require no justification other than the person's decision to cross our national boundary." *Id*. at 294

(internal citation and internal quotation marks omitted). The Fifth Circuit stated that the embarrassment or indignity caused by "a canine sniff is slight at best." *Id*. Concluding that "[c]ertainly, a canine sniff, even one involving some bodily contact, is no more intrusive than a frisk or a pat-down, both of which clearly qualify as routine border searches." *Id*. at 295. The Fifth Circuit affirmed the district court's denial of Kelly's motion to suppress. *Id*.

In *Plumas*, students at a high school were told to exit the classroom. 192 F.3d at 1263. The students walked past a trained narcotics canine and a deputy sheriff as they exited the classroom. *Id*. The canine alerted to a student other than the plaintiff. *Id*. As the students waited outside the classroom, the canine sniffed the property left in the classroom. *Id*. As students reentered the classroom, they again passed the deputy sheriff and the canine, which then alerted to the same student. *Id*. No drugs were discovered at the school that day. *Id*. Plaintiff brought a § 1983 action in district court alleging that these actions violated his Fourth Amendment rights. *Id*. at 1262. The district court denied plaintiff's motions for a preliminary injunction, for class certification, and for summary judgment and granted the defendant's motions for summary judgment. *Id*. at 1263. The plaintiff appealed to the United States Court of Appeals for the Ninth Circuit. *Id*. The Ninth Circuit then considered if the canine sniff was a search. *Id*. at 1265–66. The Ninth Circuit acknowledged that the Supreme Court has held that canine sniffs of objects are not searches. *Id*. at 1265 (citing *Place*, 462 U.S. at 707). However, "the level of intrusiveness is greater when the dog is permitted to sniff a person than when a dog sniffs unattended luggage." *Id*. at 1266. (internal citation omitted). Additionally, the "close proximity sniffing of the person is offensive whether the sniffer be canine or human." *Id*. (quoting *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 479 (5th Cir. 1982)). Therefore, the Ninth Circuit held that the random canine sniff of the students constituted a search. *Id*.

The Court finds that the intrusiveness of the canine search did not rise to the level of a non-routine search, which would require reasonable suspicion. Further, the Court believes *Kelly* is particularly instructive and finds that the canine search is less intrusive than a pat-down search and requires no individualized suspicion at the international border.

Accordingly, the Court partially rejects Magistrate Judge Velasco's Report and Recommendation (Doc. 30) and denies Defendant's motion to suppress (Doc. 20).

**<u>CONCLUSION</u>**

In light of the foregoing discussion, IT IS HEREBY ORDERED as follows:

(1)   The R & R (Doc. 30) is rejected, in part, and adopted, in part.

(2)   Defendant's Motion to Suppress (Doc. 20) is denied.

(3)   The Government's request for an evidentiary hearing (Doc. 32) is denied.

(3)   This case is referred back to Magistrate Judge Velasco for pertinent pretrial proceedings.

Dated this 3rd day of January, 2019.

Honorable James A. Soto
United States District Judge